**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| In Re: | ) | Case No. 17-31897 (JJT) |
| | ) | Jointly Administered |
| CLINTON NURSERIES, INC., et al., | ) | |
|    Debtors. | ) | Chapter 11 |
| | ) | |
| CLINTON NURSERIES, INC., et al., | ) | |
| by and through the Official Committee of | ) | |
| Unsecured Creditors as Authorized Estate | ) | |
| Representative to Pursue Avoidance Actions | ) | |
|    Plaintiffs, | ) | Adv. Pro. Case No. 19-03030 (JJT) |
| | ) | |
| v. | ) | |
| | ) | RE: ECF No. 36 |
| PIRTLE NURSERY, INC., | ) | |
|    Defendant. | ) | |
| | ) | |

**MEMORANDUM OF DECISION**
**ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is a summary judgment motion (AP-ECF No. 36, the "Motion")[1] filed by CN Trust, the Plaintiff and the bankruptcy estate representative authorized to pursue avoidance actions. CN Trust commenced this Adversary Proceeding in 2019 against Pirtle Nursery, Inc. ("Pirtle") to avoid and recover five prepetition transfers of funds totaling $25,000 (the "Subject Transfers") made by Clinton Nurseries of Maryland, Inc. ("CNM") to Pirtle during the 90-day prepetition period (the "Preference Period").

In its Complaint, CN Trust seeks to: (i) avoid the Subject Transfers under 11 U.S.C. § 547(b), (ii) deny all defenses, (iii) recover the value of the Subject Transfers under 11 U.S.C. § 550, (iv) preserve the avoided transfers for the benefit of the bankruptcy estate under 11 U.S.C. §

---

[1] All citations to the docket of this Adversary Proceeding are designated as "AP-ECF No. ___."

551, and (v) disallow any Proof of Claim filed by Pirtle under 11 U.S.C. § 502(d). Pirtle heretofore has not filed a Proof of Claim in the Debtors' bankruptcy case. Count One of CN Trust's Complaint asserts a cause of action for avoidance and recovery of preferential transfers under 11 U.S.C. §§ 547(b), 550, and 551. Count Two asserts a cause of action for the disallowance of claims under 11 U.S.C. § 502(d). CN Trust's Motion only seeks summary judgment on Count One of the Complaint.

Pirtle asserts several affirmative defenses in its Answer. Pirtle principally asserts an "agricultural lien defense," where Pirtle argues that it held a security interest on CNM's tree crops grown on Pirtle's Tennessee farm under Tennessee Code §§ 66-12-101, 66-12-102, and 66-12-113. Pirtle has also asserted core defenses to liability under 11 U.S.C. § 547(c) for contemporaneous exchange, ordinary course of business, and subsequent new value. In addition, Pirtle asserts the following affirmative defenses: (i) that it took for value in good faith without knowledge of the voidability of the transfer, (ii) that the transfers did not diminish the estate because Pirtle shipped the mature tree crops to CNM post-petition, and (iii) that CNM has failed to state a claim upon which relief may be granted.

For the reasons set forth below, CN Trust's Motion is denied.

## I.    JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceedings under 28 U.S.C. § 1334(b), and the Bankruptcy Court derives its authority to hear and determine this matter on reference from the District Court under 28 U.S.C. § 157(a) and (b)(1) and the General Order of Reference of the United States District Court for the District of Connecticut dated September 21, 1984. This matter is a core proceeding under 28 U.S.C. §§

157(b)(2)(F), (H), and (O) pertaining to avoidance actions and claim disallowance arising under the Bankruptcy Code.[2]

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)). Additionally, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249.

"Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 256). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported

---

[2] Title 11 of the United States Code is also known as the Bankruptcy Code.

motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby, Inc.*, 477 U.S. at 247–48 (emphasis in original).

While the evidence relied upon at the summary judgment stage need not be presented in admissible form, it must, however, be capable of being presented at trial in admissible form. *In re Soundview Elite Ltd.,* 543 B.R. 78, 100–01 (Bankr. S.D.N.Y. 2016) ("[Rule 56(c)(2)] provides for the exclusion of matter that cannot be presented in a form that would be admissible in evidence—not that is *not* so presented." (emphasis in original)).

## III.    BACKGROUND

### A.  Procedural Background

On December 18, 2017 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors consist of Clinton Nurseries, Inc. ("Clinton Nurseries"), CNM, Clinton Nurseries of Florida ("CNF"), and Triem, LLC ("Triem"). These cases were jointly administered as *In re Clinton Nurseries, Inc.*, Case No. 17-31987 (JJT).[3] On January 4, 2018, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") under Bankruptcy Code § 1102. BR-ECF No. 50. By order dated August 15, 2019, the Court authorized the Committee to act as the designated representative of the bankruptcy estate and pursue claims under Chapter 5 of the Bankruptcy Code. BR-ECF No. 824. On January 9, 2020, this Court confirmed the Debtors' Plan of Reorganization (the "Plan"). BR-ECF No. 1045. Pursuant to the Plan, CN Trust was created for the primary purpose of collecting, holding, administering, distributing, and liquidating the trust

---

[3] The Chapter 11 cases of Clinton Nurseries, Case No 17-31897, CNM, Case No. 17-31898, CNF, Case No. 17-31899, and Triem, Case No. 17-31900 are jointly administered under Case No. 17-31897. All citations to the docket of the Debtors' main bankruptcy case are designated as "BR-ECF No. ___."

assets in accordance with the terms and conditions of the Plan. Pursuant to a letter dated January 24, 2020, Anthony Calascibetta (the "Trustee") was appointed as the Trustee to the CN Trust.

On December 16, 2019, CN Trust commenced this Adversary Proceeding against Pirtle. Compl., AP-ECF No. 1. On May 20, 2020, Pirtle answered the Complaint and asserted its affirmative defenses. Answer, AP-ECF No. 30. On March 10, 2022, CN Trust moved for summary judgment on the basis that it had satisfied each essential element of its claim under 11 U.S.C. § 547(b) and that none of Pirtle's affirmative defenses applied. Pl.'s Mot. for Summ. J., AP-ECF No. 36; Pl.'s Mem. of Law, AP-ECF No. 38, ("CN Trust's Mem."), (collectively, the "Motion"). On March 24, 2022, Pirtle objected to the Motion, contending that genuine disputes of material fact and several defenses raised in its Answer precluded summary judgment (AP-ECF No. 39, the "Objection"). That same day, Pirtle filed a document entitled "Defendant's Local Rule 7056-1 Statement," which consisted of the Declaration of Danny Pirtle ("Pirtle Declaration"), the owner of Pirtle.

On April 7, 2022, CN Trust filed a reply memorandum in support of its Motion, in which CN Trust objected to Pirtle's deficient Local Rule 56(a)(2) Statement on the basis that it (i) failed to reproduce each numbered paragraph in CN Trust's Local Rule 56(a)(1) Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as required by Local Rule 56(c), (ii) failed to include a separate section entitled "Additional Material Facts" setting forth any additional facts that Pirtle believed would establish a genuine dispute of material fact, in violation of Local Rule 56(a)(2)(ii), and (iii) failed to cite to any evidence, let alone admissible evidence, in violation of Local Rule 56(a)(3).

The parties initially declined oral argument on the Motion, requesting instead that the Court decide the issues based on the parties' briefs. On October 25, 2022, after review of the

Motion, the Court entered an Order to Show Cause (AP-ECF No. 42) as to why the Court should not grant CN Trust's request to deem all facts set forth in its Rule 56(a)(1) Statement as admitted for purposes of this Motion based on Pirtle's failure to file a Rule 56(a)(2) Statement. On October 27, 2022, Pirtle filed its Local Rule 56(a)(2) Statement (AP-ECF No. 43, "Def.'s Stmt."). On October 28, 2022, the parties appeared for the Show Cause hearing. The Court entertained substantive argument on the Motion, after which the Court allowed Pirtle's late filing of its Local Rule 56(a)(2) Statement and took the matter under advisement. On November 11, 2022, CN Trust filed a supplemental memorandum in support of its Motion (AP-ECF No. 46, "Pl.'s Supp. Mem."). On December 22, 2023, the Court ordered CN Trust to respond to Pirtle's Statement of Additional Material Facts contained in its Local Rule 56(a)(2) Statement (AP-ECF No. 47). On February 24, 2023, CN Trust filed its response to Pirtle's Statement of Additional Material Facts (AP-ECF No. 48, "Pl.'s Response to Def.'s SAMF").

### B. Factual Background

The Court finds that the following facts are undisputed based upon a review of the summary judgment record, the relevant pleadings in this Adversary Proceeding and the related bankruptcy case, and the Rule 56 Statements filed by each party in accordance with Local Rule 56 of the Local Rules of Civil Procedure of the United States District Court for the District of Connecticut.

### 1. *Debtors' Operations and Pre-Petition Activity*

Clinton Nurseries is a regional wholesale plant nursery with headquarters in Clinton, Connecticut. Clinton Nurseries is a holding company for its wholly-owned affiliates, CNM and CNF, both of which also operate wholesale plant nurseries in Maryland and Florida. Pl.'s Stmt. ¶ 8; Def.'s Stmt. ¶ 8. Triem owns a single-family residence in Connecticut, and owns real estate in

Maryland from which CNM operates, in part. Triem is owned and controlled by members of the family who manage Clinton Nurseries' businesses and serve as their shareholders. One of the shareholder families occupies the residence. *Id.* ¶ 9. Another entity owned by Debtors' management owns and controls the real estate in Connecticut, Maryland, and Florida. *Id.* ¶ 10.

During the Preference Period, Debtors, including CNM, were insolvent and unable to pay their debts as they became due. Debtors' customer base shrank significantly due to consolidation in the landscaping supply and gardening industry and currently consists of two customers that account for more than 90% of their business. *Id.* ¶ 11. Bank of the West (the "Bank"), Debtors' primary secured lender, claims to hold a blanket security interest in Debtors' operating assets, including Debtors' cash collateral, as well as mortgages on real estate owned by Debtors. *Id.* ¶ 12; The Bank has an allowed secured claim of $29,418,576.39, for which each Debtor is jointly and severally liable. *Id.*; *see also* Claim No. 34-1 on file in the Claims Register for Case No. 17-31897. As of the Petition Date, CNM owned assets with a book value of $17,455,730.00 and had liabilities of $39,351,303.56. *Id.* ¶ 13. CNM was unable to pay the Bank's debt at that time. *Id.* ¶ 17. After a failed attempt to restructure the Debtors' loans, the Bank filed a lawsuit in state court against the Debtors to collect the amount due on the loan and moved for appointment of a receiver in that case. *Id.* ¶ 14–16. The Debtors ultimately filed for Chapter 11 bankruptcy because of the Bank's collection action. *Id.*

### 2. *CNM's Relationship with Pirtle*

In 2016, Pirtle and CNM entered an agreement (the "Agreement) for the provision of the labor, goods, "rent," and services necessary for growing trees. Def.'s Stmt. ¶ 18. Agreement, AP-ECF No. 38-1. The Agreement called for CNM to pay Pirtle a $20,000 fee up front in exchange for potting the trees. Thereafter, payment of $5,000 was due to Pirtle on the first of each month

beginning on the first of May. *Id.*; Def.'s Stmt. ¶ 19. Under a section entitled "Leasing of the land to grow containers," the Agreement describes the scope of work in terms of the number of trees to be planted (in this case, 100,000 trees). Pirtle was to "furnish labor for the storage of plants, root pruning, labor to pot and put on container pads, fuel for tractors and equipment, Electricity, wear and tear on potting machine, and any other expense incurred in the labor part of getting the trees potted on on *[sic]* the container pad." CNM was to "furnish the all *[sic]* containers, fertilizer, lime, Gypsum, Pine Bark and any other product Dave wants to incorporate into the mix except Talstar for which Pirtle will incorporate into mix for Japanese beetle." Once the trees were planted on the container pads, CNM was responsible for "the payment of all labor to do with the trees, such as topping, suckering, pruning, etc." and Pirtle was responsible for "watering trees daily or as needed, and spray all chemicals to keep the container pads clean of weeds and grass, and also Fingicides *[sic]* and Insecticides until dormancy."

The Subject Transfers consist of the following check transactions:

| Check Number | Check Date | Payee | Check Amt |
|---|---|---|---|
| 001051 | 12/7/2017 | Pirtle Nursery, Inc. | $  5,000.00 |
| 001007 | 11/16/2017 | Pirtle Nursery, Inc. | $  10,000.00 |
| 000917 | 10/16/2017 | Pirtle Nursery, Inc. | $  5,000.00 |
| 000882 | 10/3/2017 | Pirtle Nursery, Inc. | $  5,000.00 |

Def.'s Stmt. ¶ 21.

Payment of the Subject Transfers by CNM occurred prepetition and satisfied all payment obligations under the Agreement. At some unidentified time near the conclusion of the growing season, CNM collected the mature trees from Pirtle. It is not clear whether the trees were harvested pre- or postpetition. It is also not clear what type and number of trees were planted and

maintained on Pirtle's farm, or the fair value of those trees, at the time each Subject Transfer was made under Agreement.

## IV.   DISCUSSION

### A.   Count One: Avoidance of Preference Payments under 11 U.S.C. § 547(b)

Section 547 of the Bankruptcy Code empowers a trustee to recover as preferences certain payments made to creditors within the ninety-day period preceding the date of filing of the debtor's bankruptcy petition. 11 U.S.C. § 547. Under Section 547(b), CN Trust has the burden of proving, by a preponderance of the evidence, that the Subject Transfers are "transfers of the debtor's property which are: 1) made to or for the benefit of a creditor; 2) for or on account of an antecedent debt; 3) while the debtor was insolvent; 4) within ninety days of the filing (or within one year of the filing if made to an insider); and 5) which enable the creditor to receive more than it would otherwise receive in a Chapter 7 liquidation case." *In re Artha Mgmt., Inc*., 174 B.R. 671, 676–77 (Bankr. S.D.N.Y. 1994); *see* 11 U.S.C. § 547(b); 11 U.S.C. § 547(g). "A transfer which is proven avoidable under § 547(b) may be recovered from the initial transferee or the entity for whose benefit the transfer was made." *In re Artha*, 174 B.R. at 677; *see* 11 U.S.C. § 550(a).

Here, CN Trust seeks to avoid all five of the Subject Transfers as preferential. There is no dispute in this case that each of the Subject Transfers meets the requirements of the first, third, and fourth elements of 11 U.S.C. § 547(b). The second and fifth elements, however, require further discussion.

### 1.   *For or on Account of Antecedent Debt – 11 U.S.C. § 547(b)(2)*

As to the second element of CN Trust's claim, under 11 U.S.C. § 547(b)(2), CN Trust must prove that each transfer is "for or on account of an antecedent debt owed by the debtor

before such transfer was made." The Bankruptcy Code does not define "antecedent debt." Nonetheless, for purposes of this section, an "antecedent debt" is "a debt which is incurred prior to the relevant transfer." *See In re Artha*, 174 B.R. at 678 (citing *In re Intercontinental Publications, Inc.*, 131 B.R. 544, 549 (Bankr. D. Conn. 1991)). A debt is incurred "when it arises and not when payment is due." *In re Big Apple Volkswagen, LLC*, No. 11-11388 JLG, 2016 WL 1069303, at *10 (Bankr. S.D.N.Y. Mar. 17, 2016) (citing *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 347 (Bankr. S.D.N.Y. 1999)). In other words, "[a] debtor incurs a debt on the date upon which the debtor first becomes legally bound to pay." *In re FBI Wind Down, Inc.*, 614 B.R. 460, 477 (Bankr. D. Del. 2020) (internal quotation marks omitted).

CN Trust argues that the Subject Transfers to Pirtle were made on account of an antecedent debt because each transfer was intended as payment for an obligation that was already due and owing as of the first of each month under the Agreement. CN Trust's Mem. at 8. CN Trust relies primarily on the Declaration of Anthony Calascibetta (AP-ECF No. 38-1 (the "Calascibetta Declaration") to support this contention, which includes a table that matches each Subject Transfer with the corresponding invoice that CN Trust argues it relates to. The table created by CN Trust is as follows:

| Invoice Number | Invoice Date | Check Number | Check Date | Invoice Amount | Check Amount | Days to Pay ("DTP") |
|---|---|---|---|---|---|---|
| | | 000882 | 10/3/2017 | | $5,000.00 | |
| 20171001 | 10/1/2017 | | 10/3/2017 | $5,000.00 | | 2 |
| | | 000917 | 10/16/2017 | | $5,000.00 | |
| 2017AUG | 8/1/2017 | | 10/16/2017 | $5,000.00 | | 76 |
| | | 001007 | 11/16/2017 | | $10,000.00 | |
| 20171101 | 11/1/2017 | | 11/16/2017 | $5,000.00 | | 15 |
| | 9/1/2017 | | 11/16/2017 | $5,000.00 | | 76 |
| | | 001051 | 12/7/2017 | | $5,000.00 | |
| 20171201 | 12/1/2017 | | 12/7/2017 | $5,000.00 | | 6 |

CN Trust asserts that the October 3, 2017 transfer was intended as payment for the October 1, 2017 invoice (No. 20171001). Pl.'s Response to Def.'s SAMF ¶ 6. CN Trust, however, has not provided any admissible evidence to support this contention. Pirtle argues that the October 3, 2017 transfer was intended as payment for the September 1, 2017 invoice, but likewise has failed to produce any admissible evidence to support this contention. The only evidence offered by Pirtle is the Pirtle Declaration, which otherwise does not squarely address this issue. Pirtle, however, objects to CN Trust's reliance on the Calascibetta Declaration on the basis that the Trustee admittedly lacks personal knowledge of the parties' intended payment arrangement for these invoices. The parties similarly dispute the relevant invoice for each of the remaining Subject Transfers. Pl.'s Response to AMF ¶¶ 6(B), (C), and (D). The Court therefore finds that CN Trust has failed to show the absence of a genuine dispute of material fact, and that Pirtle has demonstrated the existence of a genuine dispute of material fact, on this element. Accordingly, this element is not satisfied.

### 2. Greater Recovery than in Chapter 7 – 11 U.S.C. § 547(b)(5)

As to the fifth element, under 11 U.S.C. § 547(b)(5), CN Trust must prove that the transfers

> (5) . . . enable[] such creditor to receive more than such creditor would receive if—
>
> > (A) the case were under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5).

To satisfy this element, CN Trust must prove that Pirtle "received more as a result of the preference than if the preference was never paid, and instead, the transferee received a

distribution on its claim in a hypothetical chapter 7 case." *In re Teligent, Inc.*, 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) (citing *Taunt v. Fidelitiy Bank of Mich. (In re Royal Golf Prods. Corp.)*, 908 F.2d 91, 95 (6th Cir. 1990)). "The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date." *Id.* The analysis should include the cost of administering the hypothetical chapter 7 case, and disregard all other post-petition expenses, liens and priorities. *Id*. (citations omitted). "As a practical matter, this element is satisfied whenever the plaintiff shows that the creditor would receive less than 100% in a hypothetical chapter 7 distribution." *Id.*

CN Trust has not put forward specific facts on this element but argues that, under the Fourth Amended Disclosure Statement (BR-ECF No. 930),[4] no creditors other than the Bank would have received any payment in a Chapter 7 distribution. CN Trust considers Pirtle to be an unsecured creditor who would have shared in any pro rata distribution to creditors after the Bank is paid because it argues that the Agreement with Pirtle is a services contract that does not give rise to a security interest. Pl.'s Mem. at 8.

Under its "agricultural lien defense," Pirtle argues that the Agreement is a "lease" that gave rise to a secured lien under Tennessee law, making it a secured creditor who would be paid in full (to the extent of its lien) before any payments are made to unsecured creditors. Def.'s Obj. at 2. There are two components to Pirtle's defense: first, that the Agreement is a lease, and second, that certain Tennessee statutes governing agricultural landlords provide Pirtle with a secured lien on CNM's tree crops grown on Pirtle's farmland.

The parties have provided thin briefing on the issue of whether the Agreement is a lease or services contract. CN Trust takes the position that the Agreement is a services contract

---

[4] On October 30, 2019, the Court approved the Fourth Amended Disclosure Statement (ECF No. 940).

because it does not include a devise of exclusive possessory control over specific property. Pl.'s Reply at 4. The Court disagrees.

"The cardinal rule in the construction of contracts is to ascertain the intent of the parties. If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. The language used in a contract must be taken and understood in its plain, ordinary, and popular sense. In construing contracts, the words expressing the parties' intentions should be given the usual, natural, and ordinary meaning. If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. Courts cannot make contracts for parties but can only enforce the contract which the parties themselves have made." *Pitt v. Tyree Org., Ltd.*, 90 S.W.3d 244, 252 (Tenn. Ct. App. 2002) (citations and internal quotation marks omitted).

"In order to be valid and enforceable, a lease generally must contain the following essential terms: (1) the names of the parties, (2) a description of the demised realty, (3) a statement of the term of the lease, and (4) the rent or other consideration." 49 Am. Jur. 2d Landlord and Tenant § 22.

Agricultural or farmland leases can have attributes of both a lease and a sales or services contract, but the distinguishing feature of a farm lease is that it involves the possessory use of farmland for growing crops. *See generally, Lewis v. Lewis Nursery, Inc.*, 80 N.C. App. 246, 251, 342 S.E.2d 45, 47 (1986) (applying North Carolina law); *Planters Bank & Tr. Co. v. Sklar,* 555 So. 2d 1024, 1035 (Miss. 1990) (applying Mississippi law); *Meyhoeffer v. Wallace*, 35,025 (La. App. 2 Cir. July 11, 2001), 792 So. 2d 851, 855 (applying Louisiana law); *In re Est. of Sauder*, 283 Kan. 694, 710, 156 P.3d 1204, 1215 (2007) (applying Kansas law). Agricultural leases also

have certain characteristics that distinguish them from a traditional lease of commercial or residential property. *See, e.g., Christensen v. Iowa Dep't of Revenue*, 944 N.W.2d 895, 907 (Iowa 2020). "The primary purpose of a farm lease is for use of the land, either to grow crops, harvest timber, or raise livestock, and the lessee is generally responsible for caring for the land. To the extent there are structures on the land, they are often secondary to the primary purpose of the farm lease. On the other hand, the primary purpose of a commercial or residential lease is to utilize a building, either to live in under a residential lease or to house a business operation under a commercial lease." *Id.*

CN Trust relies on *Doramus v. Rogers Grp., Inc.*, No. M199800918COAR3CV, 2001 WL 196974, at *8 (Tenn. Ct. App. Feb. 28, 2001) (citing *Davis v. Dinkins*, 585 N.Y.S.2d 978, 981 (N.Y. Sup. 1992), *modified by Davis v. Dinkins*, 206 A.D.2d 365, 613 N.Y.S.2d 933 (1994)) for the following proposition:

> It is well settled that the test for determining what constitutes a lease, as distinguished from other rights or interests, is not necessarily the descriptive language used, but whether it is the manifest intent of the parties that exclusive control and possession of specified space for a specified term has been granted. Thus, it is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property.

CN Trust argues that the Agreement does not devise exclusive control and possession of Pirtle's farmland to CNM because merely reciting the word "lease" in the text of the Agreement does not by itself make it a lease. Pl.'s Supp. Mem. at 4. CN Trust further argues that "no one at CNM occupied [Pirtle's] real property . . . . [n]o CNM employees exercised any dominion or control over any aspect of [Pirtle's] property" and that "[t]he Agreement says nothing about exclusive possession or contains any typical lease requirements." *Id.* CNM, however, has not provided

14

admissible evidence to support this contention. For its part, Pirtle has not provided any authority on distinguishing a lease from a services or sales contract.

Here, although the Agreement has some commonly understood attributes of a sales or services contract, the plain language of the Agreement fulfills the basic requirements for the formation of a lease of farmland. CNM was indisputably granted the right to use, occupy and possess the portions of the container pads that held the planted trees. No one else possessed rights to use or occupy that discrete space. The Agreement clearly identifies the name of each party, specifies that the lease term is for the 2016 growing season beginning on the first of May, and specifies the monthly $5,000 rental payment. *Cf. Carl Clear Coal Corp. v. Huddleston*, 850 S.W.2d 140, 145 (Tenn. Ct. App. 1992) (holding mineral lease was more similar to a sales contract because it did not provide for a monthly payment of rent). Although agricultural leases customarily specify the rental rate in terms of the acreage being used to produce the crops, that is not the only way to define the specific piece of land at issue. Defining the rental rate in terms of the number of trees to be planted on the farm is necessarily a substitute for specifying the acreage because the number of trees planted represents the acreage necessary to accommodate the size of that crop.

In addition, although the Agreement describes the monthly payment as a "fee," it also dictates that the payment recurs monthly, similar to a monthly rental obligation. The Agreement does not condition this "fee" on the success or failure of the tree crops or any other contractual variables that might impact the value of the harvested crop. It is therefore clear from the plain language of the Agreement that the monthly "fee" of $5,000 was intended as a monthly lease, use, or rental payment for one particular growing season during which CNM would tend to the

tree saplings and grow them to maturity before harvesting them. The Court finds that this monthly payment constitutes "rent" for CNM's use of Pirtle's land to grow the trees.

Further, the fact that the Agreement allocates some responsibility between Pirtle and CNM does not transform it from a lease into a services contract. The Agreement states that "Pirtle will supply enough container pads to pot the 100,000 trees, for a fee of $5000.00 per month, due on first day of each month, until trees are removed from property." Agreement, AP-ECF No. 38-1. The Agreement provides that CNM would be responsible for all labor to maintain the trees and that Pirtle would "not be responsible for any trees that die or do not grow off as they should." Agreement, AP-ECF No. 38-1. In this context, Pirtle acted as a landlord who provided some attendant functions to maintain the land, but the responsibility of maintaining the tree crops was placed on CNM. Any disputes between the parties as to who actually performed what aspect of the Agreement are not relevant where the plain language unambiguously defines each party's responsibilities.

For these reasons, the Court concludes that the Agreement constitutes a lease, as it embodies, in substantial part, a landlord/tenant relationship between Pirtle and CNM.

### B. Pirtle's Agricultural Lien Defense

Under the second component of its "agricultural lien defense," Pirtle argues that it possessed a landlord's lien on the tree crops grown during the Spring 2016 growing season under Tennessee Code § 66-12-101. Section 66-12-101 states:

> A landlord and one controlling land by lease *or otherwise* shall have a lien on all crops grown on the land during the year for the payment of the rent for the year, whether the contract of rental be verbal or in writing, and this lien shall inure to the benefit of the assignee of the lienor.

Tenn. Code. Ann. § 66-12-101 (emphasis added). The plain language of this statute clearly indicates that Pirtle possessed a landlord's lien on CNM's tree crops during the Spring 2016

growing season. *See Bramlett v. Hurley*, 160 Tenn. 653, 28 S.W.2d 633, 634 (1930) (Landlord's lien on tenant's crop applies to current year and crop only.).

Agricultural or farmland leases usually grant the landlord a lien as recourse in the event a dispute arises. "Tenants who rent land for cash are owners of the crops and have an absolute right to sell them. Where land is leased and rent is to be paid in cash rather than a share of the growing crops, a landlord's only recourse in the crops would be through an agreement with the tenant to give a security interest in the crops. A landlord and tenant are tenants in common of growing crops, as personal property, where rent is reserved in a share of the crops. 21A Am. Jur. 2d Crops § 23 (footnotes omitted); *see also Lone Oak Farm Corp. v. Riverside Fertilizer Co*., 229 Neb. 548, 553, 428 N.W.2d 175, 178 (1988) ("If . . . the lease is on a cash rent basis, the cotenancy relationship does not exist. In this situation the landlord's only recourse in the crops would be through an agreement with the tenant to give a security interest in the crops.").

Pirtle also argues that it possessed a laborer's lien under Tennessee Code § 66-12-113 for the labor necessary to "grow, maintain and utilize machinery and services to [CNM's] plants." Def.'s Mem. at 3. Section 66-12-113 states:

> When any person shall perform any labor or render services to another in accordance with a contract, written or verbal, for cultivating the soil, and shall produce a crop, such person shall have a lien upon the crop produced, which shall be the results of such person's labor, for the payment of such compensation or wages as agreed upon in the contract.

Tenn. Code. Ann. § 66-12-113. The plain language of the Agreement stating that Pirtle provided labor to pot the trees on the container pads and water them throughout the growing cycle clearly indicates that Pirtle possessed a lien for each month of the 2016 growing season where CNM owed a $5,000 monthly payment. Although the parties disagree which months the five Subject

Transfers applied to, Pirtle had a lien in the amount of $5,000 for each of those months under the Agreement.

Finally, Pirtle argues that it possessed a landlord's lien for goods and money supplied under Tennessee Code § 66-12-102. Section 66-12-102 states:

> A landlord and one controlling land by lease or otherwise shall have a like lien on all crops of tenants or sharecroppers, grown during the year on the land, for the payment of necessary food, household fuel, money and clothing supplied during the year to such tenant or sharecropper or those dependent upon such tenant or sharecropper.

Tenn. Code. Ann. § 66-12-102. This section generally applies to agreements where the tenant accepts a share of the crops as payment for the labor it provides while tending to those crops. *See Mann v. Taylor*, 52 Tenn. 267, 270 (1871) (An agreement on the part of one who is to do the labor, to take charge of and manage the land on shares is not a lease, but a contract for the payment for services rendered by a part of the crop raise;  if the agreement be for the division of the specific crops, the owner of the land and the occupant or farmer are not partners but tenants in common of the crops, and either party may sell or mortgage his portion of the crops.). Under the plain language of the Agreement, Pirtle did not supply "necessary food, household fuel, money and clothing" to CNM and, therefore, Pirtle did not possess a lien under this statute.

CN Trust argues that, even if Pirtle initially held a valid lien under Tennessee law, Pirtle's failure to commence an action for enforcement of the lien in a timely manner terminated the lien as of July 1, 2017 under Tennessee Code § 66-12-105. Section 66-12-105 provides that "[t]he liens shall expire and be barred after July 1, following the crop year, unless a proceeding for its enforcement be commenced before that date." Tenn. Code Ann. § 66-12-105. This argument fails, however, because the parties agree that CNM paid Pirtle prepetition for all amounts owed under the Agreement, and thus Pirtle had no reason to commence an enforcement

action under this statute because its liens were paid in full long before July 1 of the following crop year.

Neither party, however, has put forth admissible evidence indicating the precise number of planted trees or their fair value at the time each Subject Transfer was made. Thus, genuine disputes of material fact remain as to whether Pirtle's liens were sufficiently secured at the time of each Subject Transfer so as to defeat any avoidance claims.

### C. Pirtle's 11 U.S.C. § 547(c) Defenses

Because Pirtle's "agricultural lien defense" is likely dispositive of this case, the Court, as a matter of judicial restraint, will at this juncture refrain from fully addressing the three core additional defenses in avoidance of liability under 11 U.S.C. § 547(c): contemporaneous exchange, ordinary course of business, and subsequent new value. Pirtle's core defenses in avoidance of liability under 11 U.S.C. § 547(c) are likely partial defenses to liability, but involve genuine disputes of material fact that would preclude summary judgment on all of the Subject Transfers.

#### 1. *Contemporaneous Exchange for New Value – 11 U.S.C. § 547(c)(1)*

The contemporaneous exchange defense under 11 U.S.C. § 547(c)(1) "protects transactions that were meant to be cash transactions, but which unavoidably involved a brief extension of credit." *In re FBI Wind Down*, 614 B.R. at 495–96 (internal quotation marks omitted). "The defense is intended to encourage creditors to continue to deal with troubled debtors by preventing trustees from avoiding payments that were clearly intended to support a new transaction instead of an antecedent debt." *Id.* (internal quotation marks omitted).

"To gain a contemporaneous exchange of new value defense, [Pirtle] must prove (1) it extended new value to the debtors; (2) the parties intended the disputed transfers to be

contemporaneous exchanges; and (3) the exchanges were, in fact, substantially contemporaneous" *Id.* ((internal quotation marks omitted).

CNM has failed to explain why transfers acknowledged as monthly rental payments made within two, six, or fifteen days of the invoice date should not be considered substantially contemporaneous.

### 2. *Ordinary Course of Business – 11 U.S.C. § 547(c)(2)*

"The 'ordinary course of business' defense balances debtor and creditor interests, in order to 'induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *FBI Wind Down*, 614 B.R. at 486. "Under Section 542(c)(2), a trustee may not avoid a transfer if such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (A) made in the ordinary course of business of the debtor and transferee [ (the "Subjective Test") ], or (B) made according to ordinary business terms [ (the "Objective Test") ]." *Id.* (internal quotation marks omitted).

CNM argues that none of the Subject Transfers were made in the ordinary course of business because they were not made according to the pre-Preference Period dealings between the parties. Pl.'s Mem. at 9. Neither party, however, has provided sufficient facts relevant to the parties' pre-Preference Period terms or practices for the monthly payment of invoices, such as whether payment was customarily due within thirty days or on some other term. CNM's own analysis shows that the Subject Transfers were paid on average within forty-two days.[5]

---

[5] Pirtle disputes that the invoices were paid on a 42-day average but has not provided any admissible evidence to support its position. *See* Def.'s Stmt. ¶ 22. The Pirtle Declaration upon which Pirtle relies does not address the pre-Preference Period course of dealing between the parties. *See generally* Pirtle Declaration, AP-ECF No. 40.

According to CNM, the October 3, 2017 transfer for $5,000 was paid within two days of the invoice date, half of the $10,000 transfer on November 16, 2017 was paid within fifteen days of the invoice date, and the December 7, 2017 transfer was paid within six days of the invoice date. CNM, however, has not explained why these transfers are not within the ordinary course when they were paid well under the average 42-day norm between the parties.[6]

In addition, CN Trust argues that Danny Pirtle, Pirtle's owner, pressured CNM into making the Subject Transfers. CN Trust produced an email sent by Danny Pirtle on March 4, 2020 to Attorney Jeffrey Sklarz, counsel for CN Trust, that states "[s]ometimes [CNM] was late getting payments to me and I would have to call and rush it up or I would have to cut the electrical to the water." Email from Danny Pirtle to Jeffrey Skarlz, AP-ECF No. 38-2. This email, however, merely shows that Pirtle pressured CNM at some unidentifiable point in time that may or may not be connected to the Subject Transfers. In any event, such alleged pressure alone would not eliminate a contemporary exchange or subsequent new value defense.

### 3. Subsequent New Value – 11 U.S.C. § 547(c)(4)

"The Section 547(c)(4) new value defense allows a creditor to retain an otherwise voidable preference if the creditor gave the debtor new value after the preferential transfer." *FBI Wind Down.*, 614 B.R. at 499 (internal quotation marks omitted). "New value is defined as 'money or money's worth in goods, services or new credit . . . that is neither void nor voidable by the debtor or the trustee under applicable law.'" *Id.* (quoting 11 U.S.C. § 547(a)(2)). This defense is intended to encourage creditors to work with companies on the verge of insolvency . . . . [and] to ameliorate the unfairness of allowing the trustee to avoid all transfers made by the debtor to a creditor during the preference period without giving any corresponding credit for

---

[6] Although Pirtle responded to CN Trust's ordinary course analysis in its Local Rule 56(a)(2) Statement, it has failed to produce any countervailing facts or legal authority that would negate CN Trust's contentions.

advances of new value." *Id.* (internal quotation marks omitted). "As long as

the new value augments the estate in the same proportion as the value of the transfer, the estate,

and consequently other creditors, are not harmed." *Id.* (internal quotation marks omitted).

There exists a judicial split in authority as to whether new value must be paid or unpaid.

*See Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation, LLC)*, 899 F.3d 1178 (11th Cir.

2018) (joining Fourth, Fifth, Eighth, and Ninth Circuits in applying a more expansive reading of

Section 547(c)(4) that includes all new value supplied by the creditor during the preference

period and not merely new value that remains unpaid on the petition date); *In re Prescott*, 805

F.2d 719, 731 (7th Cir. 1986) (new value must remain unpaid for Section 547(c)(4) defense to

apply); *N.Y.C. Shoes Inc. v. Bentley Int'l Inc. (In re N.Y.C. Shoes Inc.)*, 880 F.2d 679, 680 (3d

Cir. 1989) (reaching conclusion similar to the Seventh Circuit in *In re Prescott*). The Second

Circuit has not definitely spoken on this issue and courts within the Second Circuit have taken

varying positions. *See In re Pameco Corp.*, 356 B.R. 327, 341 (Bankr. S.D.N.Y. 2006) (new

value must remain unpaid); *In re Teligent, Inc.*, 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004) (new

value must remain unpaid); *but see Van Dyck/Columbia Printing v. Katz*, 289 B.R. 304, 315 (D.

Conn. 2003) ("Section 547(c)(4) was not designed to limit credit for subsequent advances only to

advances that remained unpaid, as such an interpretation would limit the exemption

in § 547(c)(4) to one subsequent advance when Congress clearly contemplated its application to

more than one exchange." (internal quotation marks omitted)).

The parties' briefing on this issue is sparse and does not substantively address the split in

authority. As a factual matter, the scant facts advanced herein indicate that subsequent new value

may have been advanced each month by Pirtle when it continued to lease the land to CNM and

water the plants after each Subject Transfer.

22

**D.  Pirtle's PACA Defense**

Pirtle finally argues that it is a secured creditor entitled to retain the Subject Transfers under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq*. CNM argues that PACA only applies to "perishable agricultural commodities," which do not include trees. The Court agrees. PACA imposes a "non-segregated floating trust" on "perishable agricultural commodities" and their derivatives that allows the sellers of commodities to "maintain a right to recover against the purchasers superior to all creditors, including secured creditors." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995) (citing 7 U.S.C. § 499e(c)(2) and 7 C.F.R. § 46.46(c)). Under PACA, the term "perishable agricultural commodity":

> (A) Means any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and
>
> (B) Includes cherries in brine as defined by the Secretary in accordance with trade usages.

7 U.S.C. § 499a(b)(4). The regulations promulgated under PACA further define "fresh fruits and fresh vegetables" as:

> Fresh fruits and fresh vegetables include all produce in fresh form generally considered as perishable fruits and vegetables, whether or not packed in ice or held in common or cold storage, but does not include those perishable fruits and vegetables which have been manufactured into articles of food of a different kind or character. The effects of the following operations shall not be considered as changing a commodity into a food of a different kind or character: Water, steam, or oil blanching, battering, coating, chopping, color adding, curing, cutting, dicing, drying for the removal of surface moisture; fumigating, gassing, heating for insect control, ripening and coloring; removal of seed, pits, stems, calyx, husk, pods rind, skin, peel, et cetera; polishing, precooling, refrigerating, shredding, slicing, trimming, washing with or without chemicals; waxing, adding of sugar or other sweetening agents; adding ascorbic acid or other agents to retard oxidation; mixing of several kinds of sliced,

23

chopped, or diced fruit or vegetables for packaging in any type of containers; or comparable methods of preparation.

Here, Pirtle has not adduced any facts supported by admissible evidence that the trees grown on its farm were edible or would constitute "perishable agricultural commodities." Pirtle merely argues it "may" have rights under PACA but does not further explain its position. In addition, Pirtle did not assert PACA as an affirmative defense in its Answer and only raised it for the first time on summary judgment. The Court therefore finds that Pirtle has failed to meet its burden on that defense so as to defeat an avoidance claim.

## V.    CONCLUSION

For the foregoing reasons, CN Trust's Motion for Summary Judgment on Count One of the Complaint is denied.

Because the existence and scope of Pirtle's "agricultural lien," if supported by sufficient collateral value at the time of each Subject Transfer, would defeat CN Trust's avoidance claim in Count One of the Complaint, this Court will provide the parties with an opportunity to properly support or address any assertions of fact related to this issue. Thereafter, the Court will determine whether there is a genuine issue of material fact to be tried in that regard and whether it will grant summary judgment in favor of Pirtle. *See* Fed. R. Civ. P. 56(e)(1) and 56(f).

**IT IS SO ADJUDGED, ORDERED AND DECREED** at Hartford, Connecticut this 17th day of March 2023.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut